## Elston, et al. v. Elston.

(Decided February 17, 1925.)

### Appeal from Henry Circuit Court.

1. Deeds—Transfer of Property from Father to Son Closely Scrutinized.—Conveyances of land by father to son will be closely scrutinized, and burden is on grantee to show by clear and convincing evidence that transaction was freely and voluntarily entered into, and devoid of any vice rendering it inequitable or unfair.
2. Deeds—Evidence Held to Sustain Finding that Mental Unsoundness or Undue Influence in Execution of Deed Not Shown.—Evidence held to sustain finding of chancellor that there was not sufficient evidence, either of grantor's mental unsoundness or of undue influence, authorizing cancellation of deed executed by father to son.

TURNER & TURNER and W. B. MOODY for appellants.

H. K. BOURNE and BECKHAM, HAMILTON & BECKHAM for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—Affirming.

Appellants, who were plaintiffs below, by the petition herein attacked the validity of a deed executed June 27, 1921, by which A. Elston conveyed a track of land containing eighty-three acres to his son, Joe Elston. They insist that grantor did not have sufficient mental capacity to execute and deliver the deed and that appellee procured its execution by undue influence. The following is quoted from the deed as the recited consideration for its execution:

"That the party of the first part, in consideration of $1.00 cash in hand paid by the second party,

receipt of which is hereby acknowledged by first party, and the further consideration that the second party agrees to board, wait on and care for first party during his natural life, the first party to live at second party's home in Henry county, Kentucky. A lien is retained on the below described real estate to secure the performance of this consideration."

The grantor in the deed lived some ten months after its execution, and from the record no question is raised but that appellee, the grantee in the deed, scrupulously performed his part of the contract by providing his father, the grantor, with all the necessaries and comforts of life and with unusual care and attention. In fact, it is insisted for appellants that the marked care and attention given to the grantor in the deed by appellee is evidence that the deed was procured by undue influence and that such care and attention was so marked and solicitous as to evidence fear upon his part that if he failed in any particular to carry out his contract some of his brothers or sisters might succeed in taking his father away from him. That such an argument was made is cited merely as the best evidence possible that the grantee in the deed lived up to the contract he made. The grantor in the deed was a farmer. His wife died about 1918. All of his children had previously married and were living in homes of their own. He owned two farms and considerable personal property. After the death of his wife he could not longer live at his own home, and during the time intervening between that event and the making of the deed in question lived with four or five of his children. He purchased a house and lot at Millersburg, Kentucky, and undertook to live there with one of his daughters, a widow. They seem to have been unable to get along amicably together, and he went to the home of another of his children to live. After a few months he and the widowed daughter undertook to live together again in his home at Millersburg with no better results than at the first trial. After some three years of living about first with one and then another of his children he then made the deed in question and moved to the home of his son, appellee, Joe Elston, with whom he had not previously lived, and lived there peacefully and in happiness and contentment until his death.

It will not be questioned that decedent, who owned the farm in question, had the right to make the deal with

reference to it that was made. The cases upholding contracts of that kind are too numerous in this jurisdiction to be questioned. It is true, as contended by appellants, that transactions of this kind where a confidential relation exists between the parties will be closely scrutinized by a court of equity and the burden is upon the grantee in such a deed to show by the clearest and most convincing evidence that the transaction was freely and voluntarily entered into and devoid of any vice rendering it inequitable or unfair. There are lacking in this case two features that ordinarily are to be found among the circumstances surrounding the parties in cases where the rule above has been invoked as conclusive. The consideration for the execution of the deed was a valid one, the deed truly recited it, and the contract had been performed. (See Lockhart v. Justice, 203 Ky. 678, and the authorities therein cited.) The other missing feature is the fact that prior to the execution of the deed in question the grantor had not lived with or been in the custody of the grantee.

There are some 600 pages of testimony in this case and it would be impossible to review all of it without extending the opinion far beyond the bounds of reason. Appellants, who are the children of A. Elston and who seek to have the deed cancelled, testify that he did not have sufficient mental capacity to make it. However, the facts and circumstances testified to by them from which they drew the conclusion rob their testimony of its probative value. At most they established that the grantor was possessed of a disposition that would not be opposed in anything. When his plans and ideas were crossed he would evidence his displeasure by explosions of temper and excessive profanity. He and his widowed daughter seem to have been unable to get along at all. The trouble between them seems to have grown out of their disagreement about the propriety of the attention of gentlemen callers upon her and her daughter. One occasion made the subject of a great deal of testimony occurred while she was living with him in his home at Millersburg. On Christmas night two gentlemen had called on decedent's daughter and granddaughter. Believing the company was staying later than a proper hour the old gentleman proceeded to order them to leave the house, and in doing so used language to and with reference to all the parties which was exceedingly emphatic, profane and insulting.

The things their father said to and of this daughter are the chief basis for appellants' conclusion that he was of unsound mind.    The evidence established that for a number of years Mr. Elston had suffered from a stomach trouble which doubtless contributed to his disposition. Aside from the testimony of appellants the two gentlemen who were present on the Christmas night mentioned testified to what occurred and they concluded that he was of unsound mind.    Some two or three other witnesses testified for appellants and their conclusion as to his mental unsoundness was founded largely upon the things he had said of his widowed daughter with whom he was living.    A practicing physician gave it as his opinion that decedent was of unsound mind.    However, the effect of his testimony was weakened by its being made to appear from him that the occasions on which he treated decedent were some time prior and some time subsequent to the execution of the deed in question.    When he saw and concluded he was of unsound mind decedent was confined to his bed by illness.    He subsequently recovered, went to the doctor's office and paid him for his services himself and was about the streets of Campbellsburg frequently without evidence of mental incapacity. A doctor, S. P. Sessmer, also testified for appellants that decedent was a man of unsound mind, but his knowledge was confined to two visits by decedent to him for treatment.    The doctor seems to be a member of some branch of the profession practicing the healing art without the use of drugs.    He seems to have used some sort of electrical appliances in treating decedent.    The testimony rather establishes that decedent became dissatisfied after two treatments and declined to go to Dr. Sessmer for further treatment.

For appellee the depositions of some 49 witnesses were taken.    Included among the witnesses were men from all walks of life, merchants, bankers, farmers, barbers and blacksmiths; the friends and neighbors of decedent, many of whom had known him and had been his friends for life.    Included among the number were two practicing physicians who during the last eight or ten years of his life regularly waited upon and treated decedent.    Their testimony establishes clearly that, although decedent had for a number of years been subject to some disorder of the stomach and that in the latter years of his life he suffered from hardening of the arteries and in the last few months of his life developed cancer

of the liver, from which he died, and was then about 77 years of age, he was throughout all this time a man of sound mind, possessed of strong will, would not be opposed in his own plans, had his own convictions, and made the trade he did with his son, the appellee, in order that his old days might be spent in peace and contentment and free from the troubles and difficulties that had beset him after the death of his wife. There was no evidence introduced tending to establish that appellee exercised any character of influence over testator to procure the execution of the deed. He had never lived with him. Immediately before its execution, testator had been living with his widowed daughter. They had been unable to live peaceably and amicably together. He had been unable to find peace and contentment in the homes of such of his other children as he had lived with. The day the deed was written, early in the morning, there seems to have been some difficulty between him and the daughter with whom he was living. It appears that he went to a nearby grocery and restaurant for his breakfast. He telephoned another of his daughters to send for him that morning. Due to the fact that she had no means of doing so she was unable to send for him. He hired an automobile and went to her home. He sent for appellee, Joe Elston, who came to him and the two of them then went to the county seat and to the county court clerk's office, where the deed in question was written. A lawyer wrote the deed and his acknowledgment was taken by the county court clerk. The county clerk and one of his deputies both testified that the deed was written at decedent's direction and that at the time nothing said or done by him indicated in any manner that he was not fully advised as to what he was doing, but that, on the other hand, he appeared to be perfectly rational and sane and to know and understand fully what he was doing and what he wanted done. It would seem from the record in this case that if anything other than the consideration expressed in the deed had any bearing upon the making of the deed by decedent it was the fact that his other children with whom he had lived had failed to accord to him the care and attention that he thought were due him. It certainly is true that if such influence moved the grantor in the deed to execute it appellee is not chargeable with it. Decedent at the time was about 77 years of age. For a number of years he had required a good deal of care and attention due to frequently recurring illnesses from his disordered

stomach. There was nothing to indicate that he might not live for several years longer. The trade made by him with appellee turned out to be a good one for him only because his father did not live very long after it was made. The trade which turned out to be a good one might have been exceedingly burdensome if his father had lived the length of time that might reasonably have been expected at that time.

Under all the circumstances the chancellor found no sufficient evidence either of mental unsoundness or of undue influence to authorize a cancellation of the deed in question. It seems to this court that the evidence in the record fully sustains the chancellor's finding. Hence, the judgment is affirmed.