THE STATE, EX REL. STOECKLE, *v.* JONES, SUPERVISOR, ET AL.

(No. 7761—Decided July 6, 1953.)

*Mr. Frank H. Richter* and *Mr. R. E. Simmonds, Jr.,* for relator.

*Mr. John L. Undercoffer, Messrs. Peck, Shaffer & Williams* and *Mr. Judson Allgood,* for respondents.

*Per Curiam.* This is an action in mandamus originating in this court seeking a writ requiring the respondent Jones to issue a permit authorizing the relator to connect his premises, at No. 318 Jackson Street, in the Village of Loveland, with the public

sewer, and as an incident thereto, for an injunction restraining the respondent Fritz from taking any action against relator to enforce the penal ordinance for failure to tap, pending the final determination of this action.

The case is submitted upon the petition, the answer, and a stipulation of facts.

After the state of Ohio had joined with six other states located in the Ohio River watershed in agreement for concerted action to reduce and, if possible, eliminate the pollution of the water of the Ohio River, and after the Ohio General Assembly had enacted a law forbidding municipalities from discharging sewage into tributaries of the Ohio River, the Village of Loveland, which is located on the Little Miami River, a tributary of the Ohio River, proceeded to arrange for the construction of a sewer system and disposal plant to enable it to discontinue discharging its sewage into the Little Miami. To this end, as the village had no sewer system, the council passed a resolution on October 16, 1951, declaring it necessary to construct sanitary sewers in a large number of its streets and providing that $175,000 of the cost should be assessed by percentage of the tax value, as shown by the tax duplicate, upon all the lots and lands in the village abounding and abutting thereon or serviced thereby. Whether this description included all the taxable property is not clear.

The relator's property, located at 318 Jackson Street, was unimproved and was assessed for taxation purposes at $70. The rate of the assessment for the construction of this sewer system, based on the duplicate of August 1951 was $11.691 per hundred dollars, in accordance with which there was assessed against relator's lot the sum of $8.19, which he paid on September 11, 1952.

The cost of the sewer system and sewage disposal

plant was $575,000, so that after crediting the special assessment there remained $400,000 to be financed. This was accomplished by the issuance of mortgage revenue bonds under Section 12 of Article XVIII of the Constitution.

On July 8, 1952, the Village of Loveland passed an ordinance to regulate the establishment of connections with the sewer system and to provide for inspection thereof. It required an application for the permit to be accompanied by a fee of $5. It contained also penal provisions for the enforcement of observance of its provisions, and by another ordinance there were outlawed all other methods of disposal of sewage by those whose properties were accessible to the public sewer system.

On December 16, 1952, the Village of Loveland passed still another ordinance, which was entitled: "An ordinance providing for tap-in charges for the sanitary sewer system." In its preamble, it was recited that certain portions of the sanitary sewer system were being placed in operation and that it was deemed necessary to provide tap-in charges for property owners whose property was not listed as improved on the tax duplicate at the time or was not included in the assessment. It was then ordained that a tap-in charge of $300 should be required of owners whose property had been improved after October 16, 1951, and a like tap-in charge from owners whose property had in fact been improved before October 16, 1951, but which improvement had not been included in the tax duplicate valuation at the time. There was an omnibus provision also, requiring all owners who for any reason had not been assessed for the construction of the sewer to pay a tap-in charge of $250, and, finally, the ordinance provided that owners of property outside of Loveland not assessed for the construction of the sewers should pay a tap-in charge of $450.

We deem it worthy of calling attention to the recital in the preamble of this ordinance that a portion of the sewer system was about to be placed in operation. We infer that no part had been used by any one at the time.

All the revenue derived from the operation of the sewage disposal plant, the special assessment against the property owners, and the charges against those subject to the "tap-in" ordinance, was appropriated to the payment of the $400,000 mortgage revenue bonds and the bonds issued in anticipation of the collection of the special assessment.

Sometime after October 16, 1951, and before July 15, 1952, the plaintiff constructed a dwelling upon the lot at 318 Jackson Street, and on that date the county auditor reappraised the lot at $90, and appraised the building at $3,620, making a total value of $3,710. Thereafter, it was placed on the tax duplicate at that valuation.

On May 20, 1953, the relator presented an application in due form to the respondent Jones for a permit to connect 318 Jackson Street with the public sewer system, and tendered $5 to pay the fee required by the ordinance of July 8, 1952. The respondent declined to issue the permit, insisting that he could issue the permit only upon the relator complying with the ordinance of December 16, 1952, by the payment of $300. This action was instituted as a result of respondent Jones' refusal to issue the permit.

At the trial there was a general discussion, prompted by questions from the bench, as to what governmental power was exercised by the Village of Loveland in the enactment of these ordinances. Further study has made it clear to us that the charge of $5 for making the connection can be justified under either the police or taxing power. A charge of $5 for issuing the permit and inspecting the connection to see that

the law has been complied with could not be regarded as an excessive license fee. The impositions under the other ordinances are clearly exercises of the taxing power. It is not necessary to be more specific and determine whether they are assessments based on special benefits, a charge for services rendered, or an excise tax. In any event they would be within the power delegated to the municipality.

The Village of Loveland made no contract with the relator to maintain the *status quo*. It was engaged in legislating and was free to repeal, amend, or supplement any of these ordinances within its delegated powers, provided only that its actions were confined within constitutional limits.

The principal contention, in fact the only contention, of the relator is that these ordinances in their terms and in their operation are unequal and discriminatory, and, therefore, deny to the relator his constitutional right to the equal protection of the law. In support of his contention, the relator points to the ordinance of December 16, 1952, imposing a charge upon those who, for one reason or another, had not contributed anything or less than what the village regarded as their fair share to the construction of the sewer system. In passing upon this contention, we must bear in mind that this ordinance was designed, patently, to apply only to exceptional situations.

In determinang whether the charges imposed by this ordinançe are so unequal or discriminatory as to violate constitutional provisions, we can eliminate from our consideration the provision for charging owners of property outside Loveland $450 for the privilege of connecting with the Loveland sewer system. That provision stands apart and is justified by Loveland's complete liberty to permit or deny the use of its sewer system to those outside its borders. There is no doubt

that a reasonable differential in rates to those outside would be justified should Loveland conclude, as it manifestly has, to offer its utility to those beyond its border. See, *State, ex rel. Indian Hill Acres, Inc.,* v. *Kellogg, City Mgr.,* 149 Ohio St., 461, 79 N. E. (2d), 319; and *Louisville & Jefferson County Metropolitan Sewer District* v. *Seagrams & Sons, Inc.,* 207 Ky., 413, 211 S. W. (2d), 122, 4 A. L. R. (2d), 588.

This leaves two classes to be considered; owners who improved their property after the effective date of the assessing ordinance, and owners whose property, for any reason, had not been assessed. For the privilege of "tapping-in," the former are required to pay $300, and the latter $250.

There is no evidence that to require owners whose property was unimproved at the time to pay $300 on connecting with the sewer would operate to their disadvantage and in favor of those who had been assessed on improved real estate. Indeed, the illustration given by counsel shows just the contrary. According to this illustration, if relator's property had been improved at the time of the assessment, as it was at the time he applied for the permit, the use of the sewer would have cost him an assessment of $435.84, plus the permit fee of $5, making a total of $440.84; whereas, under the ordinances as actually passed, he will get the use of the sewer for $300, plus $8.19, plus $5, making a total of $313.19. In other words, it will cost him $137.65 less than the owner of a lot similarly improved at the time of the assessment. It would seem, therefore, that the relator has no ground for complaint of discrimination to his detriment.

As we understand the law on the subject of uniformity required by constitutional mandate, it does not prohibit all classification. It does prohibit arbitrary and unreasonable classification. If, however, a

class is established based upon some actual similarity, and the classification based thereon has some reasonable or logical relation to the object to be accomplished, such classification, for the purpose of legislation, is within the power of the law-making body, and if the purpose to be accomplished is a just object of government, the legislation is unassailable. We think the instant classification meets both requirements. Of course, owners of unimproved land have an actual similarity, if all within the class are similarly treated. That it is a just object of government to seek uniformity in bearing the burden of government, we do not doubt.

In *Hermann* v. *State, ex rel. Cooper,* 54 Ohio St., 506, 43 N. E., 990, 32 L. R. A., 734, the facts were that the City of Cincinnati had constructed a system of sewers, and to pay a part of the cost had assessed the abutting property at $2 per front foot. Some of the property owners successfully contested the assessment. Thereupon, the city adopted a rule requiring those property owners to pay their share of the cost, not exceeding $2 per front foot, before they would be granted a permit to connect their property with the sewer system.

The court held the rule to be valid and said at page 508:

"The rule in question was adopted and properly conditioned to require that those who had not paid assessments should, when desiring to use the sewer, accept an equal burden with those who had. We cannot say that the rule is unreasonable."

Certainly, *Hermann* v. *State, ex rel. Cooper,* is sufficient answer to the suggestion that the Village of Loveland having made an assessment on the tax valuation basis, authorized by Section 3812, General Code, to pay a part of the cost, could not have recourse to other methods of raising revenue for the same pur-

pose. In the *Hermann case*, the court sustained recourse to an excise tax to supplement a special assessment. Neither in that case nor in this one are we confronted with the problem resulting from the commingling of two methods of special assessments.

Counsel seek to distinguish the *Hermann case* from the case at bar by pointing out that an invalid assessment was levied in that case against the relator, whereas, in the case at bar, the assessment that was levied against the relator was valid and was paid. We consider that distinction as unimportant. In both cases an inequality resulted from the application of the assessing ordinance and the municipality resorted to its power to impose an excise tax to correct the inequality. A reading of the opinion makes it clear that the only concern of the court was the determination of whether the rule adopted was reasonable, and upon determining that, the court sustained it.

The distinction between an assessment for the construction of a sewer and a charge for its use is clearly pointed out in the case of *Carson* v. *Sewerage Commrs. of Brockton*, 175 Mass., 242, 243, 244, 56 N. E., 1, 48 L. R. A., 277, affirmed in 182 U. S., 398, 45 L. Ed., 1151, 21 S. Ct., 860, where it is stated:

"No one denies that it was a special benefit to the petitioner to have a sewer built in front of his land. That benefit was the probability that the sewer would be available for use in the future. But the city, by building it and receiving a part of the cost from the petitioner, did not impliedly bind itself or the general taxes that the sewer should be maintained forever and that the petitioner should be at liberty to use it free of further expense. If building the sewer was a special benefit, keeping the sewer in condition for use by such further expenditure as was necessary was a further special benefit to such as used it."

With reference to the charge of $250 to the hypothetical owners of fugitive property, there is no showing that any such property existed, and, for aught that appears, there is nothing upon which the provision can operate. The presence of an ineffective provision, even though discriminatory in terms would not invalidate the other provisions of the ordinance. By this we do not mean to intimate that we regard placing such owners in a separate class as being unreasonable.

The rule on this subject of the meaning of the constitutional provisions requiring uniformity of operation of laws is so clearly stated in 16 Corpus Juris Secundum, 995, that we feel justified in quoting extensively from it at pages 997 and 998:

"Discrimination alone, irrespective of its basis or effect, is not the test of denial of equal protection of the laws by a statute. A discrimination which is merely technical and in no sense substantial or unjust does not render a statute void. Also, the constitutional requirment does not prevent a state or municipality from adjusting its legislation to differences in situations and making a discrimination or distinction in its legislation in respect of things that are different, provided the discrimination or distinction has a reasonable foundation or rational basis and is not palpably, purely, and entirely arbitrary in the legislative sense, that is, outside of the wide discretion which the legislative body may exercise. The courts will not lightly assume legislative arbitrariness, nor will they draw the dividing line between rational and arbitrary legislation with a view of remote possibilities, but instead they will refuse to set aside a statutory discrimination as a denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it."

Viewing this municipal legislation either collective-

ly or separately, we fail to find any part beyond the power of the municipality.

For these reasons, our finding is in favor of the respondents.

The writ is denied.

*Writ denied.*

Matthews, P. J., Ross and Hildebrant, JJ., concur.